# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
October 13, 2004 Session

## STATE OF TENNESSEE v. GINGER JACKSON

**Appeal from the Circuit Court for Franklin County**
**No. 14462      Thomas W. Graham, Judge**

---

**No. M2003-02539-CCA-R3-CD - Filed March 4, 2005**

---

The defendant, Ginger Jackson, was convicted of solicitation of first degree murder. The trial court imposed a Range I sentence of eight years and six months. In this appeal, the defendant asserts (1) that the trial court erred by the admission of certain testimony; (2) that the trial court erred by admitting into evidence certain audiotape recordings; (3) that the trial court erred by failing to instruct the jury regarding the inaudible portions of the audiotape recordings; (4) that the trial court erred by failing to suppress the audiotape recording of the defendant's arrest; (5) that the trial court erred by denying the defendant's motion for a judgment of acquittal at the close of the state's proof; (6) that the trial court erred by excluding certain evidence offered by the defendant; (6) that the trial court erred by admitting into evidence testimony regarding lawsuits involving the defendant and various public entities; (7) that the trial court erred by failing to require the state to elect the specific date on which the offense occurred; (8) that the trial court erred by denying alternative sentencing; and (9) that the sentence is excessive. The defendant has also asked this court to review her sentence under the guidelines of Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004). The judgment of the trial court is affirmed. The sentence is modified and the cause is remanded for consideration of the defendant's suitability for probation.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed in Part; Modified in Part;**
**Remanded**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Paul D. Cross, Monteagle, Tennessee, for the appellant, Ginger Jackson.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In the spring of 2001, the defendant was involved in a bitter divorce with the victim, Anthony Jackson. During that time, the defendant approached Stacy Rackley, an acquaintance who had performed odd jobs for her, and expressed a desire to have the victim killed, explaining that "her life would be better if [the victim] wasn't around." While Rackley initially believed that the defendant was joking, he ultimately determined that she was serious. After an altercation with the victim at their son's school, the defendant arranged a meeting with Rackley. Her friend Connie Shetters, who was also involved in a contested divorce, also attended the meeting. The defendant, whom Rackley described as "enraged," told Rackley that "because of what transpired she would rather see [the victim] gone than in her son's life." She asked Rackley to poison the victim with "rat poison, . . . methamphetamines [or] [e]cstacy."

At trial, Connie Shetters, who had been a friend to the defendant for approximately ten years, testified as a witness for the state. According to Ms. Shetters, she overheard the defendant inform Rackley that she wanted to have the victim killed. She remembered that the defendant often talked about poisoning the victim. She recalled that the defendant, who "was banking on winning a pending EEO lawsuit that was against the base, multiple lawsuits," or collecting the victim's life insurance, offered to pay Rackley $20,000 to kill the victim.

Ms. Shetters testified that an incident on November 29, 2001, involving the defendant and the victim "enraged" the defendant, who, according to Ms. Shetters, suggested a "two for one deal," with Rackley. Ms. Shetters, who admitted engaging in "idle conversation" with Rackley about having her husband killed, stated that she later informed Rackley that she "wasn't interested in that." She stated that the defendant, however, persisted with her plan because she wanted custody of the couple's son, Dalton, and control of the victim's assets.

Ms. Shetters testified that on one occasion, the defendant showed her an empty liquor bottle that she had taken from the victim's residence. According to Ms. Shetters, the defendant intended to use the bottle to poison the victim. Ms. Shetters admitted that she initially denied any knowledge of the defendant's plan when questioned by the police, explaining that she was afraid and ashamed. During cross-examination, Ms. Shetters acknowledged that during the time period in which the defendant asked Rackley to kill the victim, the defendant "was in a very emotional, erratic, irrational state."

Jerry Wayne Spry, Jr., benefits manager at the victim's place of employment, testified that the defendant was named as a beneficiary on the victim's company-paid life insurance policy, which had a total death benefit of $75,000. Spry confirmed that the defendant was named as the beneficiary of the victim's pension plan, which would have entitled her to a lump sum payment of $29,594.76 upon his death, and the victim's 401(k) plan, which would have entitled her to a payment of $96,277.52.

The victim testified that he filed for divorce from the defendant in January of 2001, describing the ensuing litigation as "messy" and "terrible." He stated that the primary issues of contention were custody of the parties' minor child, Dalton, and the division of marital property. The victim admitted that he had an alcohol problem and stated that he liked to drink George Dickel whiskey and Sundrop. The victim recalled that on November 12, 2001, the Chancery Court ruled on the custody issue and provided the parties with a handwritten parenting plan. According to the victim, the Chancery Court named him as the primary residential parent and this angered the defendant.

The victim testified that approximately two weeks later an incident occurred between him and the defendant at Dalton's school. According to the victim, he sent a friend to pick Dalton up from school. When he went to the friend's house to get his son, no one was home. He then drove to the school, where he saw the defendant standing in front of her car. There were also police officers in the parking lot. The victim stated that when he got out of his vehicle, the defendant got into her car and drove toward him. In response, he got back into his vehicle and pulled into a parking spot. The defendant again drove her car toward his vehicle "like she was going to hit it" and then "came back and made several attempts to try to run at the door to keep [him] in the car." The victim described what happened next:

> I needed to go in the school to find out what was going on. I made an attempt to cross from the parking area to the sidewalk of the school. She tried to run me down then, either forwards or backwards. I was running. Then the police chief from Estill Springs came out of the school. He saw what was going on and he immediately came to me and told me to get back into my car and I asked him if it would be possible that I go in [the] school and find out what's going on. I did not know anything that was going on yet at this time. So he said go ahead and go into the school. I waited a minute and he was trying to get her out of her vehicle, telling her to stop and roll the window down, and I walked down probably 30 feet and then made a jaunt across. She came at me again with him trying, he was beating on the window telling her to stop, and I went on into the school to see what had happened or what was going on. At that time they had, the lady that I had picking up Dalton, they had carried her to the back side of the school and they escorted Dalton through the school and put Dalton in her vehicle and they drove off.

The victim stated that he had no direct contact with the defendant after this incident. Shortly before Christmas of that same year, he was informed by law enforcement that the defendant had been arrested for soliciting his murder. The victim confirmed that the defendant was named as a beneficiary on his life insurance policy, his company pension plan, and his 401(k) plan.

During cross-examination, the victim testified that during the time frame that the defendant was having discussions with Rackley, she appeared hysterical and sometimes irrational. He described her demeanor as "down right mean." The victim stated that the defendant had visited a psychologist in relation to her lawsuit against the government.

Stacy Rackley, a witness for the state, testified that the defendant wanted the victim killed so that she could have all the marital assets and sole custody of Dalton. He stated that the defendant offered him $20,000 to do the job, explaining to him that "if this occurred before the final divorce decree that she would be the heir to the life insurance policy and . . . if that didn't pan out that she had a federal lawsuit that she had filed against someone on an Air Force base." Rackley testified that he became concerned for the victim's safety and telephoned his brother-in-law, a correctional officer at the Coffee County jail, for advice. After meeting with Investigator Danny Warren of the Franklin County Sheriff's Department, Rackley agreed to secretly record a conversation with the defendant and to suggest that she hire a professional hit man. During a meeting with the defendant and Ms. Shetters on December 4, 2001, Rackley wore a recording device and suggested that the defendant procure the services of a professional hit man. Rackley testified that the defendant was not receptive to the idea of hiring a professional and that when he mentioned doing so, the defendant ordered him to lift his shirt and take down his pants so that she could determine if he was wearing a "wire." According to Rackley, the defendant did not discover the wire because it was hidden in his Tennessee Titans cap.

At the direction of Investigator Warren, Rackley returned to the defendant's residence on the next day wearing a pager that would act as a transmitting device. According to Rackley, the defendant said that she wanted the victim killed before the final divorce decree, which was scheduled to occur within the month, and suggested that he poison the victim's liquor. Rackley remembered that the defendant told him the victim would be alone at his residence between December 19 and 24. Rackley stated that one week later, while Ms. Shetters was present, the defendant again offered Rackley $20,000 to kill the victim. The following day, the defendant told Rackley that she had changed her mind and did not want the victim killed. Rackley recalled that four days later, the defendant changed her mind again and asked that he murder the victim. According to Rackley, the defendant told him that she would have an alibi between December 19 and 24 and that if they got caught, she would claim that she was "over[-]medicated."

Rackley testified that he returned to the defendant's residence on December 19 and the defendant gave him "a Sundrop bottle partially filled[,] . . . a . . . jug with just a little bit left in it [of] George Dickel[,] . . . [and] [a] liquor soaked pair of socks." Rackley recalled that the defendant informed him that the victim, a heavy drinker, typically used George Dickel and chased it with Sundrop. According to Rackley, the defendant also provided him with two sets of keys, one which belonged to the victim's Ford Thunderbird and one which belonged to the victim's Lincoln Towncar. Rackley testified that the defendant gave him the keys so that he could put the liquor soaked socks into the victim's cars and $200 to purchase poison or drugs to kill the victim. The defendant provided Rackley with directions to the victim's residence, told him where to park, and instructed him on how to gain entry into the house. Rackley stated that the defendant directed him to call her from a pay telephone after he had finished the job and informed him that "she would cry, she would be upset."

Ronald Edward Durham, a deputy with the Franklin County Sheriff's Department, who arrested the defendant pursuant to an arrest warrant at her brother's house in Coffee County on December 21, 2001, testified that when he confronted her, the defendant asked, "Is he alive?"

David Cook, Chief of Police for the Estill Springs Police Department, testified that on November 29, 2001, he was called to the Rock Creek School to escort the defendant from the premises. Chief Cook stated that he asked the defendant, who had attempted to take Dalton from school in violation of a court order, to leave the building and she did so. Approximately five minutes later, he saw the defendant in the front parking lot speeding toward the victim. Chief Cook testified that he ordered the defendant to stop her vehicle and directed the victim into the building, at which point, the victim "walk[ed] in front of the vehicle and she put it in drive and accelerated towards him that way. He went on in the building to get out of the way of the vehicle. . . . I'm beating on her door or window of the vehicle, the driver's door, telling her to stop and she just kept driving."

Franklin County Sheriff's Department Investigator Danny Warren testified that he was contacted by Investigator Billy Marcum of the Coffee County Sheriff's Department, who asked him to contact Rackley. Investigator Warren confirmed that he asked Rackley to wear a body wire so that his conversations with the defendant and Ms. Shetters could be monitored. During Investigator Warren's testimony, portions of the tape recordings of the meetings between Rackley and the defendant were played for the jury. Investigator Warren testified that after Rackley's final meeting with the defendant, Rackley gave him two one-hundred-dollar bills, two sets of car keys, a plastic bag containing socks that smelled like an alcoholic beverage, a George Dickel bottle, and a bottle of Sundrop. A tape recording of the defendant's arrest on the following day was also admitted into evidence.

Eric Burch, an attorney who represented the victim during the divorce proceedings, was called as a witness for the defense. Burch testified that during the time period surrounding her arrest, the defendant's "responses and actions were abnormal at times." He characterized the divorce as "the most heated divorce case [he had] ever been involved in." Burch stated that the defendant received nearly $250,000 in the final divorce decree. During cross-examination, Burch acknowledged that if the victim had been killed before the entry of the divorce decree, the defendant would have received more than double that amount.

Michelle Benjamin, who represented the defendant during 2000 and 2001 in a lawsuit claiming damages for emotional distress, described the defendant's mental state during that time as "very, very poor." Ms. Benjamin stated that "[a]ny time [the defendant] came [to] the office, most of the time we'd have to send her back home, . . . reschedule the appointment and t[ell] her to call beforehand if she thought she was in any better condition." She stated that the defendant was heavily medicated at the time and remembered that, shortly before the Rock Creek School incident, the defendant "seemed to be out of control of really reality." During cross-examination, Ms. Benjamin acknowledged that as to the civil litigation, the more emotional distress exhibited by the defendant, the greater the potential for damages.

I

The defendant first asserts that the trial court erred by admitting into evidence testimony regarding the incident at the Rock Creek School in violation of Tennessee Rule of Evidence 404(b). She also contends that, even if the admission of the testimony was proper, the trial court should have provided a limiting instruction. The state submits that the evidence was admissible under Rule 404(b) and that the trial court's failure to provide a limiting instruction was harmless error.

Tennessee Rule of Evidence 404 provides in pertinent part as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in

every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8] (4th ed. 2000). Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). Because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. See DuBose, 953 S.W.2d at 652.

Prior to the trial in this case, the trial court ruled the defendant's attempt to drive over the victim at the Rock Creek School was relevant and would be admissible to prove motive and intent, permissible purposes under the rule, but reserved ruling on the probative value of the evidence until trial. During the course of the trial, the court determined that the evidence was more probative than prejudicial.

In our view, the record supports the trial court's determination that the testimony was properly admitted as evidence of the defendant's intent and motive. The testimony was also admissible to establish the nature of the relationship between the defendant and the victim. "[V]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897, 905-906 (Tenn. Crim. App. 1981). The trial court specifically found that the probative value of the testimony outweighed the danger of unfair prejudice. Under these circumstances, it is our view that the trial court did not abuse its discretion by admitting testimony about the events that transpired at the Rock Creek School.

The defendant contends and the state concedes that the trial court should have provided a limiting instruction confining the jury's consideration of this evidence to the permissible purposes. The state asserts, however, that the failure to give a limiting instruction was harmless. The trial court declined to give a limiting instruction after making the following observation:

> Well, I don't think it comes in solely in 404, . . . this whole trial is supposedly about an intent, because you're admitting that admissions otherwise would be damning to you[r] client, so your only defense is intent, and so the evidence of her propensity to be mad and angry and control, even, all those matters are direct[ly] []relevant to the issue of intent. I don't know why we would have to tell a jury . . . something that might be misleading, that something is not evidence, the testimony here is not evidence, that you may consider in this case, but is only for the purpose

of motive, scheme, plan and is to be given such weight as you may determine as the common, scheme, plan, or motive. Well, you really haven't said anything there.

. . .

If the State thinks that there is some other instruction that in some way ought to be given, I'll be happy to consider anybody's choice of words, but it appears to be that when you say that some testimony is not evidence of guilt, but it may be evidence as to motive, you know. I mean, why are you saying that? If motive and intent is one of the elements of the crime, why would you say that?

Tennessee Rule of Evidence 105 provides that "[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." Tenn. R. Evid. 105; see also Howell, 868 S.W.2d at 255 (stating that "limiting instructions are critical in preventing the improper and prejudicial use of proof of other crimes"). In our view, the trial court erred by failing to limit the jury's consideration of the Rock Creek School incident. The jury should not have been permitted to speculate on the defendant's propensity to commit the crime charged. Because there was an abundance of proof of the defendant's guilt, however, the error qualifies as harmless, having no effect on the verdict. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

II

The defendant next contends that the trial court erred by admitting into evidence the audiotape recordings of her conversations with Rackley. Specifically, she claims that the quality of the audiotapes is so poor as to render them irrelevant. The state submits that the quality of the audiotapes affects the weight of the evidence and not its admissibility.

Initially, the defendant has failed to include the audiotape recordings as a part of the record on appeal. It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). The failure to prepare an adequate record for review of an issue often results in a waiver of that issue. Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).

More important, the defendant is not entitled to relief on the merits of the issue. To be admissible, audiotapes, like photographs, must be relevant to some issue at trial. See Tenn. R. Evid. 401. An audiotape may be excluded, however, if its probative value is substantially outweighed by its potential to unfairly prejudice the defendant or to confuse or mislead the jury. See Tenn. R. Evid. 403. The admissibility of evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

In this case, the audiotapes are relevant, as they are recordings of conversations between Rackley and the defendant wherein the defendant agrees to pay Rackley to murder the victim. In addition, the probative value of this evidence is so great as to substantially outweigh the danger of unfair prejudice. There was no objection to the authenticity of the tapes. That portions of the audiotapes are inaudible does not affect their admissibility. "Provided that a tape recording is properly authenticated, the incompleteness of it goes only to its weight and not to its admissibility."

-8-

State v. Harris, 637 S.W.2d 896, 898 (Tenn. Crim. App. 1982); see also State v. Beasley, 699 S.W.2d 565, 569 (Tenn. Crim. App. 1985); Aldridge v. State, 562 S.W.2d 216, 218 (Tenn. Crim. App. 1977). In our view, the trial court did not abuse its discretion by admitting the tapes into evidence.

In a related issue, the defendant asserts that because there must be a unanimous verdict, the trial court erred by failing to instruct the jury that it must unanimously agree as to what was heard on the audiotapes. The state submits that the jurors were not required to render a unanimous decision as to the content of each tape but only as to the defendant's guilt of the single charged offense.

There is, of course, a fundamental constitutional right under Tennessee law to a unanimous verdict before a conviction for a criminal offense may be imposed. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993); State v. Brown, 823 S.W.2d 576, 581 (Tenn. Crim App. 1991); see also State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988). Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a "patchwork verdict" based on different offenses. State v. Forbes, 918 S.W.2d 431, 445-46 (Tenn. Crim. App. 1995). When the proof shows the commission of multiple acts with multiple results, the results being separate criminal offenses, and there are insufficient counts in the charging instrument to accommodate all of the offenses shown, the usual precaution to assure jury unanimity is to require the election of offenses. State v. Burlison, 501 S.W.2d 801, 804 (Tenn. 1973); State v. Clabo, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995); Shelton, 851 S.W.2d at 137. "The jury's consideration must be focused on one or more charged offenses by some effective means of election, in order to ensure unanimity on those offenses and no others." Shelton, 851 S.W.2d at 138. When the state presents proof on many offenses within an alleged time period, but neglects election, the jury is essentially permitted to "reach into the brimming bag of offenses and pull out one for each count." Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996). The duty to ensure unanimity exists on the part of the trial court even in the absence of a specific request by the defendant. Burlison, 501 S.W.2d at 804; see also State v. Mitchell, 737 S.W.2d 298, 300 (Tenn. Crim. App. 1987).

In support of her position, the defendant cites State v. Rickman, 877 S.W.2d 824 (Tenn. 1994). In our view, however, Rickman is inapplicable under the facts of this case. The Rickman decision involved the state's failure to elect the particular act upon which it was relying for conviction on a charge of child rape. Here, the defendant was charged with a single count of solicitation of first degree murder based upon an accumulation of evidence over a period of time. The audiotape recordings can be classified as an ongoing negotiation between the defendant and Rackley. There is no requirement that the jurors unanimously agree on the contents of the audiotapes but only that they unanimously agree that the defendant committed the crime of solicitation of first degree murder. Because there was proof of only one offense, there was no danger of a patchwork verdict. Forbes, 918 S.W.2d at 445-46. The defendant is not entitled to relief on this issue.

III

The defendant contends that the trial court erred by refusing to suppress the audiotape recording of her arrest as violative of her right to remain silent. While the state concedes that the defendant was in custody when the recording was made, it argues that there was no error because she was not interrogated.

The standard of review applicable to suppression issues is well established. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544; State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. Odom, 928 S.W.2d at 23. This court's review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself ." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, the accused must be adequately apprised of his right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). If the "greater weight" of the evidence supports the court's ruling,

it will be upheld.  Id.  This court must conduct a de novo review of the trial court's application of law to fact.  State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda, the United States Supreme Court limited its holding to a "custodial interrogation." Miranda, 384 U.S. at 478-79.  The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444.  A person is "in custody" within the meaning of Miranda if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted).  The Court has refused to extend the holding in Miranda to non-custodial interrogations.  See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest).  In determining whether a reasonable person would consider himself or herself in custody, our supreme court considers a variety of factors, including the following:

> "the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will."

Walton, 41 S.W.3d at 82-83 (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

Because the defendant in this case had been arrested pursuant to a warrant, she was in custody.  The relevant question, therefore, is whether she was interrogated by the arresting officer.  The record establishes that the officer read the arrest warrant to the defendant and placed her under arrest.  She was handcuffed and seated in the backseat of a patrol car.  The officer did not ask the defendant any questions.  Moreover, nothing suggests that the officer made a statement or engaged in any action that was intended to illicit an incriminating response.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  Under these circumstances, it is our view that the trial court properly denied the defendant's motion to suppress this evidence.

IV

The defendant contends that the trial court erred by refusing to grant a motion for judgment of acquittal based on the insufficiency of the evidence. She argues that because she was "irrational" during the period of time that she asked Rackley to kill the victim, the state failed to establish her intent to commit the offense. She also asserts that Rackley was not a credible witness.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:
The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.
Tenn. R. Crim. P. 29(a).

This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. Overturf v. State, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 4 Tenn. Crim. App. 325, 470 S.W.2d 853 (1971). When the motion for acquittal is made at the conclusion of the state's evidence and is not granted, the defendant "may offer evidence without having reserved the right." Tenn. R. Crim. P. 29(a).

When considering a sufficiency question on appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The proof adduced at trial established that shortly after receiving an adverse ruling in her petition for custody, the defendant offered Rackley money to kill the victim. Rackley testified that he initially believed that the defendant was not serious but became concerned when her demeanor changed and she appeared intent on having the victim murdered. He reported the possible crime to the police, who fitted him with a recording device. The tape-recorded conversations establish that the defendant, on more than one occasion, offered Rackley $20,000 to kill the victim, suggesting that he do so by poisoning his drink. The defendant provided Rackley with $200 to purchase poison or drugs to put in the victim's drink and gave him a plastic bag containing nearly empty bottles of

-12-

George Dickel and Sundrop, the ingredients for the victim's drink of choice. That the defendant provided Rackley with directions to the victim's house, keys to the victim's cars, and instructions on how to get into the residence all suggest her intent to have the victim killed. There was proof that the defendant wanted the victim dead so that she could have full custody of their son and total control of the couple's assets. The jury accredited the testimony of the state's witnesses, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). In our view, the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that the defendant solicited the murder of the victim.

V

The defendant asserts that the trial court erred by refusing to allow into evidence the permanent parenting plan issued in December of 2002 and testimony regarding the stability of the defendant's relationship with the victim after she was arrested. The state submits that the trial court properly excluded the evidence as irrelevant.

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence." Tenn. R. Evid. 401. In State v. Forbes, this court discussed the standard of review of a trial court's determination of relevancy:

> "Because an assessment of whether a piece of evidence is relevant requires an understanding of the case's theory and other evidence as well as a familiarity with the evidence in question, appellate courts give great deference to a trial judge's decision on relevance issues. Often it is stated that a trial court's decision on relevance will be reversed only for an abuse of discretion. . . ."

918 S.W.2d 431, 449 (Tenn. Crim. App. 1995) (quoting Neil P. Cohen et. al., Tennessee Law of Evidence § 401.5 (2d ed. 1990)).

The defendant sought admission of the permanent parenting plan she had entered into with the victim almost a year after her arrest in an effort to show a "normalization of relations" between the parties. The trial court excluded the evidence, ruling that "to say that [the defendant and the victim] later . . . agreed to change the custody arrangement is really irrelevant . . . to the matters that this [c]ourt needs to determine." As indicated, the parenting plan offered by the defendant was developed nearly a year after the arrest of the defendant. In consequence, it was not relevant to any issue at trial. That relations between the defendant and the victim had become more stable since the defendant's arrest did not tend to make the existence of any fact more probable or less probable. In our view, the trial court did not abuse its discretion by excluding this evidence.

VI

The defendant asserts that the trial court erred by permitting evidence that she had a lawsuit pending against a military base. She also contends that the trial court erred by not granting a mistrial

when a state witness violated the trial court's ruling that identity of the defendants of the lawsuit not be revealed.

Initially, the defendant has failed to cite any authority for her argument and it is, therefore, waived. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Moreover, she is not entitled to relief on the merits of her claim. "The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). It is only when there is "no feasible alternative to halting the proceedings" that a manifest necessity exists. State v. Knight, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The defendant bears the burden of establishing a manifest necessity. State v. Seay, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). The decision to grant a mistrial is within the sound discretion of the trial court, and this court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. McPherson, 882 S.W.2d at 370.

The trial court determined that the existence of the lawsuit was relevant because it established the means by which the defendant might pay Rackley to kill the victim. The court also ruled, however, that the details of the lawsuit were irrelevant. During direct examination, Ms. Shetters testified that the defendant intended pay Rackley from the proceeds of her "pending EEO lawsuit that was against the base, multiple lawsuits."

In our view, the trial court did not abuse its discretion by admitting testimony regarding the existence of the pending lawsuit. This evidence was relevant because it established a possible source from which the defendant could pay Rackley to murder the victim. In addition, it is our view that the single reference to the details of the lawsuit had no effect upon the results of the trial. The trial court did not abuse its discretion by refusing to grant a mistrial.

VII

The defendant contends that the trial court erred by failing to require the state to elect the specific date on which the offense occurred. The state submits that election was not required because there was not proof of more than one offense. As indicated, it is our view that the tape-recorded conversations qualified as an ongoing negotiation between the defendant and Rackley rather than separate offenses of solicitation. In consequence, the state was not required to elect the offense on which it was relying for conviction. See, e.g., Burlison, 501 S.W.2d at 804; Clabo, 905 S.W.2d at 205; Shelton, 851 S.W.2d at 137. This issue is without merit.

VIII

As her final issue, the defendant contends that trial court erred by the application of certain enhancement factors and by denying full probation. The defendant has also asked this court to review the sentence in light of the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. ____, 124 S. Ct. 2531 (2004). The state submits that the defendant has waived any

-14-

challenge to his sentence under <u>Blakely</u> by failing to raise the issue at trial. Alternatively, the state asserts that the sentence is appropriate under both the terms of the 1989 Sentencing Act and under the reasoning of <u>Blakely</u>.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991); <u>see</u> <u>State v. Jones</u>, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." <u>State v. Shelton</u>, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>State v. Smith</u>, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

The presumptive sentence for solicitation of first degree murder, a Class B felony, is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the presumptive term. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the presumptive term. <u>Id.</u> A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. <u>Id.</u>

At the sentencing hearing, Laura Prosser, who prepared the presentence report, testified that the defendant exhibited considerable animosity toward the victim during their interview. She stated that she had difficulty keeping the defendant on subject and that the defendant "seemed to be obsessed by getting [the victim] into trouble."

David Cook, Chief of the Estill Springs Police Department, testified as to the incident that took place at the Rock Creek School. He reiterated that the defendant attempted to run over the victim even as he ordered her to stop her vehicle. Chief Cook added that after the victim went into the school, he got into his patrol car and pursued the defendant. He stated that the defendant did not stop, even after he had activated his emergency equipment, and he ultimately stopped the defendant

by pulling his vehicle in front of hers. According to Chief Cook, the defendant refused to open the door and officers were forced to break a window and forcibly remove her from the vehicle.

Investigator Danny Marcum testified that when he first interviewed Rackley, he learned that the defendant had also asked Rackley to kill Chief Cook and Deputy Paul Sanson, who had been involved in her arrest for the Rock Creek School incident. According to Marcum, Rackley told him that the defendant "had asked him to obtain some explosives to do harm to two police officers."

The victim testified at the sentencing hearing that he continued to fear for his safety and for that of his son, of whom the defendant had joint custody. He stated that after she was convicted, the defendant continued to display animosity toward him and had tried to get him fired from his job.

Joanne Bobo of the South Central Community Service Agency testified that she was assigned as a case officer to Dalton Jackson, the son of the defendant and the victim. Ms. Bobo stated that the defendant telephoned her in December of 2002 and related that she was concerned for Dalton's safety because the victim "was suicidal and there was guns all over the place and she wanted it stopped before he got hurt." According to Ms. Bobo, she telephoned the victim at work and asked him to meet her at his residence. Ms. Bobo then searched interior of the victim's residence and was unable to find any guns. She did find some guns locked in a safe which was located in the garage. Ms. Bobo testified that when she informed the defendant that she would not make a referral to the Department of Children's Services, the defendant became angry.

Dr. John Garrison, a clinical psychologist, testified on behalf of the defendant. He stated that the defendant initially came to him for anger management assistance. Dr. Garrison diagnosed the defendant as having a panic disorder, which he described as "a series of physical and emotional symptoms, including heart palpitations, choking sensations, difficulty breathing that can occur in reaction to different stressors. It comes suddenly, usually lasts about 10 to 15 minutes and then passes." Dr. Garrison acknowledged that the defendant exhibited substantial hostility toward the victim, explaining that she had "fixated" on the victim.

Dr. Nancy Garrison, also a clinical psychologist, testified that she had been appointed by Dalton Jackson's guardian ad litem in June of 2002 to evaluate the relationship between the defendant and Dalton. Dr. Garrison stated that the defendant had become "more calm" during therapy. During cross-examination by the state, Dr. Garrison acknowledged that the defendant never told her that she had been convicted of soliciting the murder of the victim. She stated that the defendant's expressions of anger toward the victim, while less frequent, were still present.

Patricia Sherrill, the defendant's mother, testified that she had not seen the defendant in approximately ten years because the victim had prevented her from doing so. She claimed that the victim abused the defendant.

In arriving at the sentence of eight years and six months, the trial court applied the following enhancement factors: (2) that the defendant has a previous history of criminal convictions or

criminal behavior in addition to that necessary to establish the appropriate range; and (16) that the defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(2), (16) (2003). The trial court applied enhancement factor (2) based upon the defendant's prior criminal behavior "established by the testimony of the event at the school, also by the testimony of the [victim] that encouragement to apparently assault others occurred during the marriage." The trial court found factor (16) applicable, observing that "[w]hen you tell somebody how to kill somebody based on that person's private habit and predilections that not everybody knows, . . . that is use of private trust information." The trial court applied a single mitigating factor, that the defendant was suffering from a mental or physical condition that significantly reduced her culpability for the offense. See Tenn. Code Ann. § 40-35-113(8). The court ruled, however, that this factor was entitled to only "slight" weight.

The defendant asserts that the trial court erred by applying enhancement factor (2) based upon the Rock Creek School incident. The state submits that, under the terms of the 1989 Sentencing Act, the trial court appropriately considered the defendant's criminal behavior in its application of enhancement factor (2). In our view, there was ample proof of the defendant's attack on the victim at Rock Creek School. Both the victim and Chief Cook testified that the defendant attempted to strike the victim with her vehicle more than one time. Chief Cook further stated that the defendant refused to stop when pursued by the police and eventually had to be dragged from her vehicle. Under our traditional law, the trial court did not err by applying this enhancement factor.

The defendant also contends that the trial court erred by applying enhancement factor (16), that the defendant abused a position of private trust. In State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996), our supreme court held that "[t]he determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship." Here, there was proof that the defendant and the victim had been married for more than a decade. Rackley testified that the defendant told him that the victim drank to excess and could be killed by placing poison in his liquor. She procured bottles of George Dickel and Sundrop, the ingredients for the victim's drink of choice, from his residence. The defendant also informed Rackley which days that her son would be in her custody and described what the victim would likely be doing during that period. Further, the defendant described for Rackley the layout of the victim's residence, where he kept his liquor, and where he parked his cars. By the terms of the 1989 Act, the trial court did not err by applying this factor.

The defendant also contends that the trial court erred by failing to apply three mitigating factors: that she acted under strong provocation; that the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the conduct; and that she had obtained psychiatric help. See Tenn. Code Ann. § 40-35-113(2), (11), (13). The state submits that the defendant failed to prove these factors by a preponderance of the evidence.

As to mitigating factor (2), that the defendant acted under strong provocation, the defendant asserts that her rocky relationship with the victim and their tumultuous divorce provided strong provocation for the crime. Regardless of any abuse she may have suffered while married to the

-17-

victim, the couple had been separated for over a year before the commission of the crime.  Moreover, there was proof that the defendant and not the victim was the cause of many of the conflicts during the pendency of their divorce.  Finally, that the defendant was in a bitter custody dispute with the victim does not necessarily qualify as provocation.  In our view, the trial court did not err by refusing to apply this factor.

With regard to mitigating factor (11), that the crime was committed under such unusual circumstances that it was unlikely that the defendant was motivated by a sustained intent to violate the law, the defendant argues that because her divorce from the victim is now complete, it is unlikely that she will try to have him killed again.  In our view, the defendant failed to establish that she did not possess a sustained intent to violate the law.  The proof at trial established that the defendant had discussions with Rackley about killing the victim for a period of more than two weeks.  Prior to those discussions, she had tried to strike the victim with her car in the parking lot of their son's school. Moreover, Laura Prosser, who prepared the presentence report, testified that the defendant continued to hold great animosity toward the victim.  The trial court did not err by refusing to apply this factor.

With regard to mitigating factor (13), the "catchall" factor, the defendant asserts that the trial court should have considered as mitigation her participation in counseling.  The proof at the sentencing hearing, however, established that the defendant had not sought counseling of her own accord but had been ordered to do so as a part of her divorce proceedings.  Under these circumstances, it is our view that the trial court did not err by refusing to apply this factor.  Accordingly, under the terms of the 1989 Sentencing Act, the defendant's sentence of eight years and six months is warranted.

The defendant has also asked this court to review the sentence under the reasoning of Blakely.  Initially, the state contends that the defendant's Blakely claim is waived because it was not raised in the trial court.  Recently, however, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position:

> We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum.  However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range.  To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count."  530 U.S. at 474, 120 S. Ct. at 2354.  We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1, 153 L. Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi.  See Schriro, ___ U.S. at ___, 124 S. Ct. at 2526-27.  Perhaps this resulted from the fact that Ring overruled a case that had held the

opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

In any event, even if Blakely did not establish a new rule, the United States Supreme Court in Apprendi stated that the defendant's right to have a jury find facts that increase his sentence above the prescribed statutory maximum is rooted in his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial. 30 U.S. at 476, 120 S. Ct. at 2355. In State v. Ellis, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997), this court held that although there was no common law right to waive a jury trial, Rule 23, Tenn. R. Crim. P., allowed a defendant to "waive a jury trial if the waiver is in writing and is knowingly executed." Absent a written waiver, "it must appear from the record that the defendant personally gave express consent [to waive a jury trial] in open court." Ellis, 953 S.W.2d at 221. Blakely, as an extension of Apprendi, also requires proof in the record that the defendant personally waived that right.

This reasoning is persuasive. The defendant's Blakely claim in this case has not been waived.

The United States Supreme Court's opinion in Blakely calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543.

Under the rule established in Blakely, any prior convictions may be used to enhance a sentence. The defendant had none. The other enhancement factor applied by the trial court, factor (16), is not based upon prior convictions and was not admitted by the defendant. In consequence, the holding in Blakely would preclude its application. Under the rationale of Blakely, which controls, a sentence of eight years, the minimum within the range, is warranted.

Finally, the defendant asserts that the trial court erred by denying probation or other alternative sentencing. Because we have modified the defendant's sentence to eight years, it is our view that the case should be remanded to the trial court for the consideration of her suitability for probation. The defendant was originally sentenced to greater than eight years and, therefore, was

not eligible for probation consideration. <u>See</u> Tenn. Code Ann. § 40-35-303(b). In consequence, the trial court did not consider her suitability, or lack thereof, for probation. Because the sentence must be modified to eight years under the <u>Blakely</u> rule, probation must at least be considered as a sentencing option. This court would point out, however, that the defendant remains statutorily ineligible for community corrections because she has been convicted of a violent crime against the person. <u>See</u> Tenn. Code Ann. § 40-36-106(a)(3); <u>State v. Lisa Diane Murphy</u>, No. 01C01-9708-CR-00355 (Tenn. Crim. App., at Nashville, Oct. 21, 1998). In addition, the defendant, as a Class B felony offender, is not entitled to a presumption in favor of alternative sentencing. <u>See</u> Tenn. Code Ann. § 40-35-102(6).

The conviction is affirmed. The sentence is modified to eight years. The cause is remanded so that the trial court has the opportunity to consider the defendant's suitability for probation.

_____
GARY R. WADE, PRESIDING JUDGE